# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GARY BYRNE, as Administrator of the    :
Estate of ETHAN BYRNE, DECEASED,    :
947 Edgewood Drive    :
Springfield, Pennsylvania  19064,    :
   :
     -and-    :
   :
GARY AND GENEVIEVE BYRNE, H/W,    :
947 Edgewood Drive    :
Springfield, Pennsylvania  19064,    :
   :
        *Plaintiffs*,    :
   :
      v.    :
   :
SPRINGFIELD SCHOOL DISTRICT,    :    Case No.
200 South Rolling Road    :
Springfield, Pennsylvania  19064,    :
   :
     -and-    :
   :
SPRINGFIELD BOARD OF SCHOOL    :
  DIRECTORS,    :
200 South Rolling Road    :
Springfield, Pennsylvania  19064,    :
   :
     -and-    :
   :
DR. ANTHONY BARBER,    :
200 South Rolling Road    :
Springfield, Pennsylvania  19064,    :
*In his Official Capacity as Superintendent*    :
  *of Springfield School District*,    :
   :
     -and-    :
   :
JOSEPH HEPP,    :
200 South Rolling Road    :
Springfield, Pennsylvania  19064,    :
*Individually and in his Official Capacity*    :
  *as Principal of Springfield High School*,    :

|   | : |
|---|---|
| *Defendants.* | : |

## CIVIL ACTION

> *Our newspapers and television networks consistently report instances when young people harm themselves or others after being bullied by their peers.  Such occurrences may not be common within an individual school, but because reports of these tragedies are consistent and well-publicized, all school districts should realize that self-harm is a reasonably foreseeable result of bullying, without requiring specific evidence of the victim's mental state.  If a school is aware of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of the bullying might resort to self-harm, even suicide.[1]*

## I.    INTRODUCTION

1.      On October 19, 2020, seventeen-year-old Ethan Byrne ("Ethan") shot himself in the head in a desolate wooded area.  He was a senior at Springfield High School where he had been subjected to and suffered from aggressive bullying behavior which was known to the Springfield School District and other Defendants.

2.      On that day, and four days earlier, Ethan met and spoke extensively with Joseph Hepp, the School's principal, about the unrelenting consistent bullying Ethan was receiving in-person at school and through social media.

3.      On the afternoon of Ethan's passing, fully aware of the magnitude of the bullying Ethan had been enduring and its deleterious consequences on Ethan's delicate psyche and emotional state, Hepp told Ethan to "watch out because people are pissed," meaning numerous other students and their parents were angry with Ethan. Hepp did nothing else.

---

[1]*Tumminello v. Father Ryan High School, Inc.,* 678 Fed. App'x 281, 288 (6th Cir. 2017)(emphasis added).

4.      Incredibly, Hepp did not notify or otherwise attempt to notify Ethan's parents of the bullying or its consequences on Ethan.

5.      Disturbingly, the policy on bullying in effect at Springfield High School does not specify notifying the parents of students subjected to bullying, notwithstanding state requirements to the contrary and the almost universal requirement for such parental notification in policies at schools throughout Pennsylvania.

6.      Just as troubling, school districts throughout Pennsylvania are known to trivialize bullying incidents through concealment and misclassification to reduce the number of such violations the districts are otherwise required to report annually to the Pennsylvania Department of Education.

7.      Desperate, Ethan expressed in one of his last texts that he "doesn't know what to do anymore," and thereafter leaves his house to end his life.

8.      Ethan's parents were unaware of the dangers Ethan was facing.

9.      The failure to notify Ethan's parents of the bullying and foreseeable impact it was having on Ethan deprived them of the ability to take any protective action(s) on Ethan's behalf. Had Ethan's parents known the dangers he faced at Springfield High School, they would have immediately intervened and secured proper help for him. Defendants, with utter reckless wanton disregard for Ethan's well-being, and with full knowledge of the bullying he underwent, concealed and enabled a dangerous school environment to become even more so with Ethan's death.

10.     Plaintiffs now bring this suit seeking fair compensation for Ethan's untimely death and to ensure that, in the future, students in the Springfield School District are kept safe and school administration institutes appropriate mandatory training and policies so no other

instances of bullying and aggressive behavior are hidden from the parents of the students with grievous consequences.

## II.    PARTIES AND JURIDISDICTION

11.    Plaintiff Gary Byrne is the administrator of the Estate of Ethan Byrne, deceased. Plaintiffs Gary and Genevieve Byrne are the parents of Ethan Byrne. They bring this action for the benefit of the next of kin of Ethan Byrne, which includes them as his parents.

12.    Gary and Genevieve Byrne are husband and wife and are the father and mother of Ethan Byrne, residing at 947 Edgewood Drive, Springfield, Pennsylvania 19064. Gary Byrne was a member of the United States Secret Service Division, and later retired as a member of the Federal Air Marshal Service.

13.    Springfield School District ("SSD") and Springfield Board of School Directors ("SBSD") are political subdivisions capable of suing and being sued under the law of Pennsylvania. SSD and SBSD operate Springfield High School ("SHS"). SSD, SBSD, and SHS maintain a business address at 200 South Rolling Road, Springfield, Pennsylvania 19064.

14.    Defendant Dr. Anthony Barber ("Barber") was at all times relevant to this action the superintendent of SSD. Barber is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Barber is sued in his official capacity as an employee of SSD.

15.    Defendant Joseph Hepp ("Hepp") was at all times relevant to this action the principal of SHS, a school in the SSD system. Hepp is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Hepp is sued individually and in his official capacity as an employee of SSD and SHS.

16.     Jurisdiction over the federal civil rights claims is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4).  Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a). Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391 because all or substantially all events giving rise to these claims occurred in this District.

### III.     THE FACTS

17.     Ethan, born in Annapolis, Maryland, but raised in Delaware County, Pennsylvania, was a resourceful, analytic, dynamic, vibrant, inquisitive, and loving young man. He loved to swim, play musical instruments, spend time with his friends and family, and play games with his father.

18.     Ethan was active in many extra-curricular activities.  At the age of fourteen until his death, he was a junior firefighter at Springfield Fire Company 44, Springfield, Pennsylvania, where he received the Junior Firefighter of the Year Award in March 2018, performed exterior fire ground operations and conducted fire prevention, and was certified in Basic Life Support and First Aid, Naloxene, and numerous other training programs in emergency care and safety.  He was accepted and planned to attend fire school in October 2020.

19.     Ethan was also a member of the Future Business Leaders of America, SHS chapter, a participant and fundraiser for the Steve Stefani Dance Marathon which supports the 4 Diamond Association to benefit childhood cancer research, a varsity swimmer at SHS, a swim team member at Springfield Swim Club (since the age of five), a tech team support member at SHS, and a senior lifeguard at Springfield Swim Club.

20.     A National Society of High School Scholars nominee, Ethan was accepted to attend Millersville University (his first choice), Fall 2021 Semester, to take courses and ultimately pursue a career in business.

21.     Perhaps no truer understanding of the person Ethan was is better conveyed than through his own words in the personal essay he wrote when applying for college:

> I was there just to hang lights and decorate for the holiday season, maybe catch up with some friends I don't see too often, joke around, that sort of thing.  But, as it usually does with being a volunteer fireman, things didn't go as planned.  I suddenly dropped the strand of lights in my hand and traded them for blue rubber medical gloves.  It was time to go to work.
>
> Arriving in Squad 44, we pulled up behind the ambulance.  The crew (veterans of the fire service) and I (a 16-year-old with two years of experience at the time) walked up the stairs to a restaurant and pub.  A police officer ushered us into the scene.  An elderly man had gone into cardiac arrest in the middle of his meal.  A bystander had begun CPR, but soon the EMTs and medics were busy working on the patient.  I was running back and forth from the ambulance, getting them the equipment they needed.  After finally getting a pulse, we loaded the patient into the ambulance.  Realizing that the man's life was still in jeopardy, one of the medics requested from our Chief that a firefighter go in the ambulance with them to the hospital.  After the Chief asked who wanted to go, I volunteered.
>
> That night, I lost count of how many chest compressions I did, all while struggling to stand in a moving ambulance.  After a grueling 15 minutes, (which felt like an eternity) we arrived at the hospital.  The patient's care was transferred over to hospital staff, and after helping the ambulance crew decontaminate, we rode back to Springfield.  The patient did not survive, and this marked the third call I was on that the patient passed.
>
> This may seem depressing, disheartening, or any word with a negative tone.  It may also seem that my enthusiasm for the fire service diminished, but that is not the case.  Sure, when I think about my experiences firefighting, I could remember the drug overdoses, the horrific accidents, or any number of bad experiences.  But what truly defines a person's character is their continuation of a positive attitude and hard work despite setbacks.  I continue to train hard and learn.  I continue to share some of the best memories of my life with brothers who will always have my back.  In conclusion, a lesson can be learned out of this.  This lesson is often cliched, but through my experiences, those simple words ring true:  never give up.

22.     Neither of Ethan's parents had any reason to believe Ethan could ever become suicidal.

### A.  Bullying is Fostered and Covered Up

23.     It is the goal of the Pennsylvania State Board of Education to create and enhance

positive learning and teaching environments.  According to the State Board of Education, "To do

their best, students must feel safe at school.  A healthy and safe environment can help students

thrive, and every student, regardless of race, ethnicity, sexual orientation, gender identity or

expression should be provided the opportunity to learn – free from discrimination, fear or

harassment."[2]

24.     24 P.S §§ 13-1303-A and 13-1303.1-A require SSD to establish policies to assist

school personnel to identify, address, and report issues of bullying that occur between students.

25.     Section 13-1303-A requires each chief school administrator to annually provide

the Pennsylvania Department of Education a written report of all new incidents of conduct

proscribed therein, including bullying.

26.     Rules and Regulations, promulgated by the State Board of Education pursuant to

24 P.S § 13-1302.1-A, specifically "require[] schools to immediately notify the parent or

guardian of a victim or suspect directly involved in an [harassment] incident," including

bullying, proscribed under Section 13-1303-A. 22 Pa. Code § 10.25.

27.     Section 10.25 provides pertinently:

> This section engages students' parents and guardians as partners in addressing
> incidents of violence that occur on school property by requiring schools to
> immediately notify the parent or guardian of a victim or suspect directly involved
> in an incident listed in section 1303-A(b)(4.1) or (4.2) of the code.... This section
> also recognizes that circumstances may arise in which it is not possible to
> immediately reach a student's parent or guardian and, therefore, requires schools
> to document attempts made to reach a parent to show they have made a good faith
> effort to provide immediate notification.

---

[2] Education.pa.gov/Schools/safeschools/equityandinclusion/Pages/default.aspx

28.     Despite the laudable purpose of these anti-bullying provisions, school districts are known to evade them.

29.     According to then-Auditor General Eugene DePasquale in June 2020, "incidents that many students and parents would likely consider bullying are not reported by districts because of a narrow and subjective definition of bullying in state law.  As a result, complaints involving bullying are often reported as 'Student Code of Conduct' violations on a district's annual Safe School report to the Pennsylvania Department of Education."[3]

30.     As a result, "Parents may not know about bullying taking place in their schools unless their children tell them about it[.]  It's difficult – if not impossible – to make conclusions about the pervasiveness of bullying if school districts are underreporting it, as appears to be the case."[4]

31.     But, before 2020, the grim consequences of bullying sadly were well-known to the Defendants.  During the 2002-03 academic year, cyberbullying played a role in a thirteen - year-old girl's suicide, one of multiple suicides in Springfield, Pennsylvania.[5]

### B.   "Bullying" and Social Media Policies at SHS

32.     As early as January 2019, Defendants approved the sending of several emails to the families of students at SHS on such subjects as social media abuses and bullying.

33.     One such email sent by Hepp in January 2019 pertained to an "explicit and graphic video involving [a] high school aged individual" which was "circulating on social media amongst students across local area high schools."  The email noted that "social media is a

---

[3] https://www.bctv.org/2020/06/18/auditor-general-urges-updates-to-state-anti-bullying-law/.
[4] *Id*.
[5] https://www.delcotimes.com/news/schools-implement-anti-bullying-plans/ article_ec3e976d-d39f-5b79-adde-6c08f8a307ac.html.

dominant force in many of our students' lives."  As such, the email urged parents "to speak with your children[.]"  The email concluded:  "… we are taking this opportunity to reach out to you because we know that our students have their own devices, and it's here where we need your [parents] help to partner with us in educating your children on the dangers and potential misuse of social media."  The email was signed "SHS Administration."

34.    A little more than two months later, on March 25, 2019, SSD again emailed the families of students at SHS.  Focusing once again on the ills of social media, this email addressed misuse of the media to bully, harass, or intimidate.  The email gave notice that Defendants would take "appropriate action" "if students engage in behavior, in school or out of school, that has a negative impact on the teaching and learning environment."  Behaviors "of a threatening or dangerous nature" could lead to police involvement.  The email concluded that "the partnership of the home and school" can help students more wisely use social media and "promote a safe environment for our students and our school." Multiple signatories supported the contents of the email, including Defendants Barber and Hepp.

35.    Before the beginning of Ethan's senior year at SHS, SSD sent another email dated August 2, 2020, to the families of SHS students.  This email addressed social media postings involving "discrimination and harassment."  The email reaffirmed SSD's commitment "to fostering thoughtful and meaningful dialogue regarding topics which are important to our community, free from toxic and divisive conduct intended simply to cause harm to others."  Social media postings in violation of this commitment "would [be] promptly investigate[d]" and would be addressed "in accordance with [SSD's] policies prohibiting bullying, harassment, and discrimination."  Students were urged to report to administration instances of bullying,

harassment, or discrimination, and SSD reaffirmed its goal of "[c]reating a culture where students feel safe and belong .…" The email ended, "Sincerely, Joseph Hepp, SHS Principal."

36.     At all relevant times, SSD maintained a policy on "Bullying and Cyberbullying" which stated "it shall be the policy of the District to maintain an educational environment in which bullying and cyberbullying are not tolerated."

37.     The SSD policy defined bullying as follows:  "Bullying shall mean an intentional electronic, written, verbal or physical act, or series of acts which occurs in a school setting and/or outside a school setting:  1. Directed at another student or students, school employee or volunteer; 2. That is severe, persistent or pervasive; and 3. That has the effect of doing any of the following – a. Substantially interfering with a student's education; b. Creating a threatening environment; or c. Substantially disrupting the orderly operation of the school."

38.     The SSD policy applied to bullying and cyberbullying that took place at school or not at school provided the bullying or cyberbullying substantially disrupted the "instructional program, operations of the District, or welfare of students, teachers and/or employees of the District."

39.     The consequences for violation(s) of the bullying and cyberbullying policy at SSD ranged "from positive behavioral interventions up to and including suspension, expulsion, and/or reports to law enforcement authorities."

40.     Unlike other bullying and cyberbullying policies at high schools throughout Pennsylvania and beyond, and the requirement under 22 Pa. Code § 10.25, SSD's bullying and cyberbullying policy shockingly did and does not mandate notice to parents or guardians.

### C.  The Events Leading to Ethan's Death

41.     The circumstances leading to Ethan's death are still not fully known. The details of his tragedy which are known have been compiled from the limited information available on Ethan's cellphone.

42.     The end of Ethan's junior year and the beginning of his senior year at SHS were substantially influenced by two major developments:  COVID-19 and political unrest.

43.     COVID-19 transformed school from in-person to remote/virtual education.

44.     The political unrest brought to the forefront of our national conversation the role of race and racism in the United States.

45.     SHS was not immune from the consequences of either COVID-19 or the political discourse and related unrest.

46.     Classes were held virtually/remotely during the Spring semester of Ethan's junior year due to COVID-19.

47.     The political unrest experienced across the United States during the summer of 2020, and at home in Philadelphia, Pennsylvania, was a major topic of discussion on social media in which Ethan was a participant.

### 1.  Summer and Early Fall 2020

48.     On June 2, 2020, in an online groupchat among soccer teamates ("groupchat"), in which Ethan was allowed to participate despite not being on the team, the topic of the civil protests in Philadelphia, Pennsylvania, and across the United States associated primarily with the "Black Lives Matter" movement, was discussed by and among the groupchat members.

49.     The groupchat included Ethan's peers, young people with varying political ideologies ranging from very liberal to very conservative, with many falling in between along the ideological spectrum.

50.     The groupchat members' differing ideologies were evident in their discussions on the ongoing protests, with some members expressing views critical of certain aspects of the protests, while others expressed their unwavering support.

51.     In a misguided attempt to "rile" Student #1, a self-avowed liberal and one of Ethan's closest, longstanding friends, in the heat of an otherwise civil (but passionate) exchange of views, Ethan admittedly made the regrettable comment that, "You're saying counterpoints that have nothing to do with what I'm saying cause u can't dispute n*****s doing n****r shit."

52.     Understandably, Ethan's comment was renounced by other members of the groupchat with most members responding, "Ethan, you can't say the n word," or words to that effect.

53.     Student #1's response, however, was more pugnacious.  According to Student #1, "1. Ur [Ethan] racist 2. Ur [Ethan] a piece of s**t" and Student #1 threatened to send Ethan's comment to "black twitter" so that "u [Ethan] ain't going to college."

54.     Others in the groupchat immediately responded to Student #1's threat to share Ethan's comment with others outside the groupchat with such replies as "[Student #1] that's f***ed up if u send that s**t to someone" and "not saying that's [Ethan's comment is] not f***ed but that's his whole future."

55.     Ethan apologized profusely for his insensitive comment, and confessed to those in the chatgroup that he (Ethan) was in the wrong for making the comment.

56.     The next day, June 3, 2020, Ethan separately texted Student #1, his very close friend.

57.     Ethan asked Student #1, "Bruh u actually gonna send that [Ethan's June 2nd comment] to people?"

58.     Student #1 replied, "No.  It was [a joke]," meaning Student #1's threat was an idle one with which he did not intend to follow through.

59.     Relieved by Student #1's reply, Ethan responded, "I'd honestly probs [probably] kms [kill myself] if I'm being honest if that happens," meaning if Student #1 shared Ethan's June 2nd comment with others outside the groupchat.

60.      For the remainder of the summer and early fall, Ethan's foolish June 2nd comment and Student #1's threat to share it with others outside the groupchat were forgotten and never further raised or discussed.

## 2.  Start of the 2020 School Year

### a.  Thursday, October 15, 2020

61.     Because of the COVID-19 pandemic, Ethan's senior year at SHS began remotely, with no students physically present at the school.

62.     By mid-October 2020, SSD determined that on-campus classes could proceed on a rotational basis, meaning students would be on-campus certain days while studying remotely on the other days.

63.     Ethan's first day back on-campus at SHS after being away from school for seven (7) months was Thursday, October 15, 2020.

64.     After his lunch period, Ethan was unexpectedly called to the principal's office. Ethan did not know why he was being summoned to meet with Hepp.

65.     In the meeting, Hepp told Ethan that Student #2, an African-American female co-student, reported to Hepp that Ethan had called her a "n****r" that day during lunch.

66.     Stunned, Ethan responded that he had not made such a comment to Student #2, and was flabbergasted why Student #2 would make such a claim about him.

67.     After the meeting with Hepp, Ethan sent Student #2 a private massage via Instagram and asked why she had made such a deplorable claim about him to Hepp.

68.     Student #2 responded to Ethan by sending him a screenshot of his June 2nd comment in the groupchat, a screenshot which someone had earlier sent to Student #2.

69.     Until that moment, Ethan had not known that his June 2nd comment had been shared with anyone outside of the groupchat.

70.     Scared and confused, Ethan began to wonder who else his June 2nd comment had been shared with.  Anxious, he worried whether someone sent the comment to his future college, and that, if someone had, he would be ostracized and his acceptance letter might be withdrawn. As another member of Ethan's groupchat had remarked, "Like that's something no colleges f**k around with."

71.     Based on the physical characteristics of the screenshot Student #2 sent to Ethan, Ethan could tell that the source of the screenshot had been Student #1, who first denied doing it when confronted in the groupchat, but eventually owned-up to his violation of trust.

72.     As he explained to Ethan and the other groupchat members, sometime before October 15th, Student #1 and Student #2 "were talking abt [about] white ppl [people] saying the n word and I sent that cus it was somewhat funny, she not gonna send it around I'm like good friends w [with] her. I thought it was a joke."

73.     Ethan responded to Student #1 that "She [Student #2] put it on some form of social media and mr hepp brought it to my attention that's how I found out in the first place.  So that's a lie [Student #1]."

74.     Others on the groupchat expressed sincere concern for Ethan, telling Ethan that "U [Ethan] should be aware of what a loudmouth b***h [Student #2] is." Others on the groupchat chastised Student #1, saying "Bro but now Ethan could be in deep s**t for something that just did not need to leave this gc [groupchat]," and "his [Ethan's] future on the f**king line because u wanted to be funny to f**king [Student #2]."

75.     Later on October 16, 2020, Student #1 informed the groupchat that:

> Ard [alright] well I talked to [Student #2], she said she sent it to a few ppl [people], which is my fault for sending to her in the first place, I'm getting her to have anyone who she sent it to delete it, and apparently hepp don't know abt [about] the screenshot, if anything more comes abt [about] it let me and Ethan know.

76.     Also, later on October 16, 2020, Student #1 privately texted Ethan, "Ard [Alright] I'm sorry [Student #2] said she showed a couple friends, I didn't think that would happen.  I thought it was just something that was gon [gonna] be in the sc gc [soccer groupchat]."

77.     When asked how Hepp learned about Ethan's June 2nd comment, Ethan privately responded to Student #1 that "He [Hepp] said it was on 'social media' and 'brought to his attention,'" presumably by Student #2.

78.     Student #1 then speculated that, "What I think happened was that [Student #2] sent the pic [the screenshot by Student #1 of Ethan's June 2nd comment] to somebody and they thought the text was from like present day and that u were talking abt [about] her, sorry."

79.     Ethan responded, "Oh ok that makes sense."

**b.  Monday, October 19, 2020**

80.     Three days later, on Monday, October 19, 2020, Ethan was back on campus at SHS.

81.     Upon Ethan's arrival at SHS, he was harassed and bullied by Student #2 and her friends.

82.     The bullying was intense and severe.  According to Ethan in a private text to another student, Student #2 "and her friends are behind me laughing and talking about me.  I can't do this bro."  Ethan continued, "I can't wait to get out of this f**king school."

83.     Around 11:00 am, Ethan was again summoned to Hepp's office for a meeting.

84.     Afterwards, in the groupchat, Ethan described his meeting with Hepp as follows: "He [Hepp] has the ss [the screenshot by Student #1 of Ethan's June 2nd comment] but believes it's not me and just wanted to make me aware again.  A lot of ppl [people] are pissed apparently."

85.     "I've had enough of everything," Ethan despairingly wrote, "I don't know what to do anymore."

86.     In response to a question, Ethan stated, "Hepp said ppl [people] are talking about it."

87.     Another in the groupchat asked if Hepp had contacted Ethan's parents.  Ethan responded, "And no nothing to my parents."

88.     In a private text with Student #1, Ethan stated, "He [Hepp] had the ss [the screenshot by Student #1 of Ethan's June 2nd comment] and said it's been going around parents and stuff apparently but he doesn't believe it is me and wanted to 'make me aware' again.  Idt [I don't think] [Student #2] is letting it go."

16

89.     Ethan further texted to Student #1 that "He [Hepp] doesn't know your [sic] [Student #1] involved, I said idk [I don't know] where she [Student #2] got the ss [the screenshot by Student #1 of Ethan's June 2nd comment] from, and I said it wasn't me and someone probs [probably] changed the name or something but I don't know why, and he said I'm not in trouble because he thinks I didn't do it but to watch out cause pp [people] are pissed."

90.     Student #1 responded "I'm sorry bro, sorry for letting it get out, sorry for getting u in trouble, sorry for having people threaten u, it's my fault, I never thought it would be like this.  I feel so bad, Sorry."

91.     In forgiving Student #1, Ethan stated, "Don't worry about it dawg if people aren't threatening you your life isn't interesting enough.  Seriously don't worry about it s**t happens you got nothing to be sorry for."

92.     The harassment continued. Shortly after 4:00 pm, and after receiving a direct message on Instagram threatening him and his family with serious physical violence, Ethan surreptitiously took a handgun from the gun vault at home, told his mother he was going to the firehouse, and drove away.

93.     Instead of going to the firehouse, Ethan drove to a nearby town, parked his truck, walked into a desolate wooded area, and shot himself in the head.

94.     Periodically over the hours after Ethan left home, his mother texted him, asking when he could be expected to return, but received no responses.

95.     Eventually, using an iPhone application, Ethan's mother tracked his whereabouts to an address other than the firehouse, but she assumed Ethan was there on firehouse business.

96.    Just before 10:00 pm, still having heard nothing, Ethan's mother and sister, now worried, decided to drive to the firehouse.  When they arrived, they learned that Ethan's truck was not parked there.

97.    Becoming even more worried, Ethan's mother and sister drove to the location indicated by the iPhone application.

98.    They found Ethan's truck parked there, surrounded by dark, isolated woods with no one around.

99.    Ethan's mother and sister began to search the area, frantically walking through the woods using the iPhone application to guide them.  They also called the police, the firehouse, and Ethan's father.

100.    A policeman arrived and joined the search for Ethan.

101.    It was not long thereafter that Ethan's mother found him on the ground in the woods, unresponsive.

102.    Horrified and screaming, Ethan's mother tried to comfort her seventeen-year-old son.  CPR was started, but to no avail.

103.    All attempts to revive Ethan were stopped as he could not be saved.  He had no pulse.  Ethan's mother was screaming through her tears at the police officer that Ethan had been murdered.  She pleaded for the officer to "Do something!  Someone murdered my son!" She was barely able to walk back to her car with her daughter.

104.    Ethan's father arrived when Ethan's mother and sister were at the car.  He went to the scene and knelt next to his son to say goodbye. He was aghast to learn that Ethan's wound was self-inflicted.

105.    Neither of Ethan's parents had any idea what could have caused him to kill himself.

106.    Ethan's firehouse colleagues insisted on carrying his body to the ambulance.

107.    Not long after Ethan's death, Ethan's aunt came to the Byrnes' house furious. Friends had contacted her after learning of Ethan's death.  They told her Ethan had been unmercifully bullied, harassed, and tormented by his schoolmates.

108.    Later, when pressed, a friend of Ethan's mother, fearful of losing her job at SHS, divulged that it was common knowledge at SHS that Ethan had been bullied since February or March 2020.

109.    It was reported to the Byrnes family that after Ethan's death, Student #2 was overheard calling him a "racist," calling for "the burning down of the lunch table where the racist sat," and imploring her circle of friends not to donate to Ethan's GOFundMe page, which had been set up by Ethan's friends to provide for a memorial for Ethan at the firehouse and scholarships and charitable donations made in his name.

110.    Hepp twice called the Byrnes' home to express his condolences before the family learned of Ethan's bullying.  He said nothing of his meetings with Ethan on October 15th and 19th or of the surrounding events.

> C.    **Defendant Hepp was Deliberately Indifferent to the Danger Ethan Faced and His Actions and Inactions Increased the Risk of Danger to Ethan.**

111.    Prior to Ethan's death, Hepp knew Ethan was under severe attack for a regrettable insensitive comment he had made many months before which was now circulating widely in the unforgiving atmosphere of high school, only further exacerbated by the unfolding events of 2020.

112.    Hepp knew that Ethan was in SHS' custody and was dependent on Hepp and the other Defendants to protect him.

113.    In October 2020, Hepp knew the consequences of bullying, and why such conduct was supposed to be prohibited at SHS.

114.    Hepp further knew that a victim of bullying might resort to self-harm, even suicide.

115.    Twice, Hepp spoke at length with Ethan as the racially charged matter involving Student #2 and others intensified.

116.    Hepp had more than adequate time to investigate the bullying but did absolutely nothing despite a duty to do so and despite the school's policy and state requirements.  There was no discipline for the bullying students.  And, Hepp's failure to notify Ethan's parents was deliberately indifferent.

117.    Despite more than ample time to reflect upon the seriousness of the situation and choose an appropriate course of action, Hepp concealed the bullying of Ethan and elected not to notify Ethan's parents or otherwise inform them of the danger.

118.     Instead, Hepp left it to a seventeen-year-old boy to figure out how best to handle the situation alone, when the boy "didn't know what to do anymore" and the relentless attacks on him continued to mount out of control.

119.    Hepp's only response was to add to Ethan's mental anguish by warning him forebodingly that "people are talking about this" and "watch out because people are pissed."

120.    While Hepp warned Ethan to "watch out," Hepp did nothing to de-escalate, investigate, or mitigate the situation or aid the minor in his care.

121.     Just as sadly, the Defendants, collectively, have not investigated the bullying Ethan suffered at SHS leading up to his suicide, or why Ethan took his own life.

122.     A few months after Ethan's death, after his parents had spoken with a few of Ethan's classmates following his funeral, Ethan's parents, desperate to understand why their only son had ended his life, emailed Hepp requesting a meeting to discuss his knowledge and understanding of the events in the days leading up to Ethan's death. They were told they could not meet with Hepp.  They begged SHS to reconsider and allow them to meet with Hepp.  Their requests remain unanswered to date.

123.     The Defendants did nothing to protect Ethan from the bullying. They were deliberately indifferent.

124.     The Defendants had ample time to share potentially lifesaving information with Ethan's parents before he committed suicide, even if just a single phone call.  They chose not to.

125.     The Defendants', particularly Hepp's, actions and omissions shock the conscience, and were negligent, knowing, deliberately indifferent, reckless, extreme, and outrageous.

126.     Defendants SSD, SBSD, and Barber ratified Hepp's actionable conduct and are thus liable for their violation of Ethan's substantive due process rights. SSD, SBSD, and Barber did not conduct a meaningful investigation of Hepp's conduct, did not discipline or retrain Hepp, or author new policies to protect students.  To the contrary, Hepp continues to be employed by SSD.

127.     Further, SSD's policies were and are insufficient to protect students from the consequences of bullying.  The policies do not require notification of parents, despite the fact

that such notification is required by the Pennsylvania Board of Education and stated in the bullying policies adopted and followed at high schools located throughout Pennsylvania.

128.    It is believed and therefore averred that the Defendants did not train or adequately supervise staff or students of SSD, including SHS, on the notification of parents of students involved in bullying incidents.

129.    It is believed and therefore averred that the Defendants' actionable conduct was substantially motivated by their desire not to have to report this incident as a bullying violation as required under the law.

130.    The sufficiency of the Defendants' response to bullying is belied by their failure to inform parents of students involved in such incidents.

### D.    Damages

131.    The Defendants' actions caused Ethan severe emotional distress.  Ethan suffered physical injuries and associated severe mental and emotional distress from being a victim of and witness to bullying.

132.    This severe mental and emotional distress was a substantial factor that led to his suicide, the ultimate personal physical injury.

133.    Both Ethan's mother and father have suffered severe emotional distress as a result of his tragic and very untimely death.  The entire family is now in therapy and taking prescription medication for anxiety and depression.

134.    Ethan's birth enabled the Byrnes to understand how much love they had to give. They miss their only son every day.  Their lives feel empty without their son.  They have flashbacks of images of Ethan's remains that they are unable to ignore.  It is difficult for them to be around families with sons and watch those parents and their sons interact.

135.     The Byrnes lost a future with their only son.  They will never see Ethan graduate from high school or college, nor be able to attend their son's wedding or see the joy on Ethan's face when Ethan had his own family. They will never be able to share precious moments with Ethan or see their son's dreams realized.

136.     The Byrnes have flashbacks and see only Ethan and his smile.  They miss Ethan's sense of humor and the way they spent hours together.  They feel robbed of a life filled with Ethan's joy.  At times, late at night, they cannot tell if this is a bad dream or real life.  They are haunted by the images of high school students berating, taunting, and hurting their young son.

137.     Ethan's parents' distress, circumstances, and responses were reasonably foreseeable.

138.     Plaintiffs have suffered, among other things, the following damages as a result of the Defendants' wrongful conduct as described above:  loss of services, loss of society, including loss of companionship, relationship, consortium, care, assistance, advice, mental anguish, pecuniary losses, and funeral and burial expenses.

**COUNT I**
**42 U.S.C. § 1983**
**SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER**
*All Plaintiffs v. All Defendants*

139.     The averments in the foregoing paragraphs of this Complaint are incorporated herein as though set forth in full.

140.     Defendants have, under color of state law, deprived Ethan Byrne and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution, including the right to due process under the Fourteenth Amendment, and specifically to be free from affirmative actions directly increasing Ethan's vulnerability or otherwise placing him in danger and taking away from his parents their ability to protect him.

23

141.     Defendants acted with deliberate indifference when they put Ethan's life at risk and caused him to suffer greatly before his death. Defendants acted with deliberate indifference when they concealed from his parents the danger Ethan was in at school, causing them serious emotional distress when they could not protect him.

**COUNT II**
**42 U.S.C. § 1983**
**SUBSTANTIVE DUE PROCESS – SHOCKS THE CONSCIENCE**
*All Plaintiffs v. All Defendants*

142.     The averments in the foregoing paragraphs of this Complaint are incorporated herein as though set forth in full.

143.     Defendants have, under color of state law, deprived Ethan Byrne and Plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution, including the right to due process under the Fourteenth Amendment, and specifically to his right to be free from government actions that shock the conscience.

144.     Defendants' actions put Ethan Byrne's life at risk and caused him to suffer greatly before his death, the source/origin of which was personal physical injury.  Defendants acted with deliberate indifference when they concealed from Ethan's parents the danger Ethan was in at school, causing them serious emotional distress when they could not protect him.

**COUNT III**
**42 U.S.C. § 1983**
**MUNICIPAL LIABLITY**
*All Plaintiffs v. All Defendants*

145.     The averments in the foregoing paragraphs of this Complaint are incorporated herein as though set forth in full.

146.    Defendants failed to provide an adequate policy to guide defendants, school officials, and teachers responding to bullying, violence, and student-on-student aggression such as what happened to students like Ethan.

147.    Defendants failed to adequately train and supervise defendants, school officials, and teachers on how to respond to incidents like those experienced by students like Ethan Byrne.

148.    Defendants failed to conduct a meaningful investigation into the actions of Hepp and thus ratified his actions as official SSD policy, causing SSD to be liable for Hepp's constitutional violations.

149.    Additionally, SSD had a policy and/or custom of not notifying parents of students involved in bullying incidents.

150.    The failure to provide adequate policies, training, supervision, monitoring, and investigation of Hepp's actions was outrageous and deliberately indifferent to the rights of students, including Ethan Byrne.

151.    Defendants' rules, regulations, customs, policies, usages, procedures, inadequate training and supervision, and ratification of Hepp's actions, were all inadequate and unreasonable and were the moving force behind the constitutional deprivations suffered by Ethan Byrne and Plaintiffs.

152.    As superintendent, Barber is the final decision-maker for all SBSD policies, practices, and decisions.

153.    To the extent that Hepp acted in violation of SBSD or SSD policies, he was acting as a final decision-maker, whose actions were final and unreviewable and were not constrained by the official policies of superior officials.

154.    Further, Hepp established, maintained, ratified, and/or acquiesced in the above discussed policies or customs.

155.    The Defendants (other than Hepp) ratified Hepp's actions.

**COUNT IV**
**42 Pa.C.S.A. § 8301**
**WRONGFUL DEATH**
*Plaintiffs Gary and Genevieve Byrne v. Hepp*

156.    The averments in the foregoing paragraphs of this Complaint are incorporated herein as though set forth in full.

157.    Plaintiffs Gary and Genevieve Byrne bring this action under 42 Pa.C.S.A. § 8301(b)

158.    The persons entitled to recover damages for Wrongful Death are as follows:

    a.    Gary Byrne – Father

    b.    Genevieve Byrne - Mother

159.    Plaintiffs demand all lawful damages for the Wrongful Death of Ethan for all persons entitled to recover such damages, including damages for expenses of estate administration, the loss of pecuniary contributions of the decedent, and the loss of decedent's care, comfort, companionship, society, guidance and tutelage.

**COUNT V**
**42 Pa.C.S.A. § 8302**
**SURVIVAL ACTION**
*Plaintiff Gary Byrne, as Administrator of the Estate of Ethan Byrne, Deceased v. Hepp*

160.    The averments in the foregoing paragraphs of this Complaint are incorporated herein as though set forth in full.

161.    Plaintiff brings this action on behalf of the Estate of Ethan Byrne and its beneficiaries pursuant to the Pennsylvania Survival Action, 42 Pa.C.S.A. § 8302, and claims on

behalf of the Estate all damages recoverable by law, including but not limited to damages for
Decedent's pain and suffering, loss of earnings, and loss of future earning capacity.

162.    Plaintiff also seeks, and is entitled to recover, punitive damages against Hepp.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

A.    Compensatory damages in an amount to be shown at trial;

B.    Punitive damages against the individual defendant in an amount to be
shown at trial;

C.    Costs incurred in this action and reasonable attorney fees under 42 U.S.C.
§ 1988;

D.    Prejudgment interest; and

E.    Such other relief as this Court may deem just and appropriate.

## JURY DEMAND

Plaintiffs request a jury trial on all claims triable to a jury.

Respectfully submitted,

**LAMB McERLANE PC**

By: */s/ Joseph R. Podraza, Jr.*
Joseph R. Podraza, Jr., Esquire
jpodraza@lambmcerlane.com
William H. Trask, Esquire
wtrask@lambmcerlane.com
One South Broad Street
Suite 1500
Philadelphia, PA  19107
Tel:  (215) 609-3170
Fax:  (610) 692-0877

*Attorneys for the Plaintiffs*