**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY BYRNE,** *et al.* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  21-3199** |
| | : | |
| **SPRINGFIELD SCHOOL DISTRICT,** | : | |
| *et al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                               **October 14, 2021**

We today review a too-common tragedy borne in some undefined part of an interactive "instant messaging" age compounded by heightened anxiety and often concealed depression possibly arising during the social isolation necessary to mitigate the spread of a pandemic over the last eighteen months.  Bullying in high schools further compounds the concerns for our promising high school students wrestling with these issues.

The parents of a seventeen-year-old high school senior now grieve his decision to take his life after enduring "aggressive bullying" at Springfield High School.  Like many other judges confronting tragic bullying-related allegations against public schools, we have great sympathy for this family.  But our governing law does not allow claims alleging harm from schools' failure to stop bullying absent the state actor's affirmative conduct changing the status quo or conduct shocking the conscience.  The family pleads absence of intuitive counseling.  They plead a theory largely based on an idea the school "should have known."  We all hope our educators can discern students in distress.  But the law does not obligate our public high school teachers to anticipate unforeseen harm caused by third parties.  We must grant Springfield's Motion to dismiss with leave to amend should the family be able to plead facts stating a claim.

I.      **Alleged Facts**

The interplay of depression, anxiety, and bullying in high school is not new to our educators.  Springfield School District assured the community of its awareness and planned steps to address bullying.  The high school principal, Joseph Hepp, sent an email to parents in January 2019 advising them to educate their children regarding the "dangers and potential misuse of social media."[1]  The School District also sent an email in March 2019 promising the District would take "appropriate action" to address negative behavior on social media.[2]  Principal Hepp sent another email shortly before the return to school amidst the pandemic in August 2020 promising the school would investigate discriminatory social media posts consistent with the school's anti-bullying policies.[3]  The School District's policy confirmed "bullying and cyberbullying are not tolerated."[4]  Springfield High would remedy bullying or cyberbullying with "positive behavioral interventions up to and including suspension, expulsion, and/or reports to law enforcement authorities."[5]  But the policy did not mandate notice to parents of bullying, despite Pennsylvania law allegedly requiring schools notify parents regarding bullying.[6]

*Ethan uses slur in online groupchat.*

Ethan Byrne prepared to begin his senior year at Springfield High School in June 2020.[7]  His parents describe him as "a resourceful, analytic, dynamic, vibrant, inquisitive, and loving young man," involved in various extra-curricular activities.[8]  Millersville University accepted Ethan to begin classes in 2021.[9]  His parents had no "reason to believe Ethan could ever become suicidal."[10]

Political unrest related to the Black Lives Matter movement "was a major topic of discussion on social media in which Ethan was a participant" in Summer 2020.[11]  Ethan participated in an online groupchat in which the members discussed Black Lives Matter.[12]  The

groupchat included Ethan's peers, who held "varying political ideologies ranging from very liberal to very conservative."[13]   Student #1, "one of Ethan's closest, longstanding friends," also participated in the groupchat.[14]   Ethan and Student #1 publicly exchanged viewpoints in the groupchat in June 2020.[15]

In the groupchat, Ethan "made the regrettable comment that, 'You're saying counterpoints that have nothing to do with what I'm saying cause u can't dispute n*****s doing n****r shit.'"[16] Ethan's peers "renounced" his comment.[17]  Most said, "'Ethan, you can't say the n word,' or words to that effect."[18]  But Student #1 "pugnacious[ly]" responded: "1. Ur racist 2. Ur a piece of s**t."[19] Student #1 threatened to send Ethan's comment to "black twitter"[20] to prevent Ethan from "going to college."[21]  Others responded to Student #1's threat it would be "f***ed up" to share Ethan's comment because "that's his whole future."[22]  Ethan "apologized profusely" and "confessed" he erred by making the comment.[23]

Ethan texted Student #1 the next day: "Bruh u actually gonna send that [comment] to people?"[24] Student #1 replied, "No.  It was [a joke]."[25]  Ethan, "[r]elieved," responded, "I'd honestly probs [probably] kms [kill myself] if I'm being honest if that happens."[26]  Ethan's comment and Student #1's threat to disclose it "were forgotten" until October 2020.[27]

### *Principal Hepp meets with Ethan regarding slur.*

Ethan's senior year at Springfield High began with classes from home as part of federal and state mandates to mitigate the COVID-19 pandemic.[28]  Ethan returned to in-person class on October 15, 2020, when Principal Hepp unexpectedly summoned Ethan to his office.[29]

Principal Hepp told Ethan "Student #2," a Black female student, told Principal Hepp Ethan had called her a "n****r" during lunch.[30]   "Stunned" and "flabbergasted," Ethan denied the claim.[31]  Ethan later asked Student #2 on Instagram why she made the claim; Student #2 responded

by sending Ethan a screenshot of his groupchat message.[32]  Ethan became "[s]cared," "confused," and "[a]nxious," wondering who else—including his future college—had seen his slur.[33]  Ethan realized Student #1 had shared his message outside of the groupchat.[34]

Student #1 explained to Ethan in the groupchat he and Student #2 discussed "white . . . [people] saying the n word" when he sent Student #2 the screenshot.[35]  Student #1 sent it because he thought "it was somewhat funny" and Student #2 would not "send it around."[36]  Other groupchat members criticized Student #1 for sharing Ethan's slur because Ethan's "future [was] on the f**king line."[37]  Student #1 told the groupchat Student #2 sent the slur to "a few" people.[38]  Student #1 asked Student #2 to have anyone to whom she sent the screenshot delete it.[39]  Student #1 privately asked Ethan how Principal Hepp obtained the screenshot.[40]  Ethan told Student #1 Principal Hepp said the screenshot "was on social media" and "brought to his attention."[41]  Student #1 speculated: "What I think happened was that [Student #2] sent the . . . [screenshot] to somebody and they thought the text was from . . . present day and that u were talking . . . [about] her, sorry."[42]

### *Ethan experiences bullying from classmates responding to the slur.*

Ethan returned to school on Monday, October 19.[43]  Student #2 and her friends "harassed and bullied" Ethan.[44]  The Byrnes describe the bullying as "intense and severe."[45]  Ethan texted a friend Student #2 "and her friends are behind me laughing and talking about me.  I can't do this bro . . . I can't wait to get out of this f**king school."[46]

Principal Hepp summoned Ethan to his office around 11 a.m. on October 19.[47]  Principal Hepp was "fully aware of the magnitude of the bullying Ethan had been enduring and its deleterious consequences on Ethan's delicate psyche and emotional state."[48]  He "knew Ethan was under severe attack for a regrettable insensitive comment he had made many months before which

was now circulating widely in the unforgiving atmosphere of high school, only further exacerbated by the unfolding events of 2020."[49]

Ethan described the second meeting with Principal Hepp in the groupchat: "He [Hepp] has the . . . [screenshot] but believes it's not me and just wanted to make me aware again.  A lot of . . . [people] are pissed apparently."[50]  Ethan also wrote, "Hepp said . . . [people] are talking about it," but Principal Hepp had not contacted Ethan's parents.[51]  Ethan privately told a friend Principal Hepp believed Ethan did not send the slur; he just wanted to "make [him] aware" of it.[52]  Ethan said Principal Hepp mentioned the screenshot had "been going around parents and stuff apparently."[53]  Ethan also said Principal Hepp told him he is "not in trouble because he thinks I didn't do it but to watch out because . . . [people] are pissed."[54]  Ethan wrote to the groupchat, "I've had enough of everything . . . I don't know what to do anymore."[55]

### Ethan takes his life.

Someone sent Ethan a direct message on Instagram around 4 p.m. the same day "threatening him and his family with serious physical violence."[56]  Ethan surreptitiously took a handgun from his home.[57]  Ethan drove to a "desolate wooded area," where he shot himself in the head.[58]  The circumstances causing Ethan's death "are still not fully known."[59]

Ethan's aunt later told Ethan's parents, Gary and Genevieve Byrne, her friends said "Ethan had been unmercifully bullied, harassed, and tormented by his schoolmates."[60]  Genevieve said "it was common knowledge at [Springfield High] that Ethan had been bullied since February or March 2020."[61]  Principal Hepp twice called the Byrnes to express condolences following Ethan's death but did not mention his meetings with Ethan.[62]

***The Byrnes sue.***

The Byrnes now sue Springfield School District; its Board of Directors; Principal Hepp individually and in his official capacity; and the superintendent, Dr. Anthony Barber, in his official capacity for creating the danger causing Ethan to succumb to his illness.[63]

The Byrnes allege Springfield failed to protect Ethan from bullying.[64]  They allege Principal Hepp "knew the consequences of bullying" and "a victim of bullying might resort to self-harm, even suicide."[65]  They further allege Principal Hepp "had more than adequate time to investigate the bullying but did not absolutely nothing despite a duty to do so" and his "failure to notify Ethan's parents was deliberately indifferent."[66]  They allege Principal Hepp "left it to a seventeen-year-old boy to figure out how best to handle the situation alone, when the boy 'didn't know what to do anymore' and the relentless attacks on him continued to mount out of control."[67]

The Byrnes seek damages under five theories: (1) violation of substantive due process for state-created danger against Springfield; (2) violation of "substantive due process – shocks the conscience" against Springfield; (3) municipal liability against Springfield; (4) wrongful death against Principal Hepp; (5) and a survival action against Principal Hepp.[68]

## II.    Analysis

Springfield moves to dismiss.[69]  Springfield argues the Byrnes' state-created danger claim fails because the Byrnes do not plead affirmative misuse of state authority, conscience-shocking activity, and foreseeable and direct harm.[70]  It argues the "shocks the conscience" claim simply restates the state-danger created claim.[71]  It argues the municipal liability claim fails because a school's failure to stop bullying does not violate students' constitutional rights.[72]  Springfield finally argues we must dismiss the wrongful death and wrongful survival actions because the Byrnes plead no other substantive claims.[73]

The Byrnes respond they plead misuse of state authority because Springfield took affirmative, conscience-shocking acts increasing Ethan's exposure to suicide.[74] They respond we should not dismiss the municipal liability claim because Springfield maintained "legally noncompliant" policies.[75] They also argue we should not dismiss their wrongful death and survival actions because they stated independent claims.[76]

We agree with Springfield as to the insufficiency of the presently plead allegations. We dismiss the state-created danger claim because (1) the Byrnes do not plead Springfield affirmatively misused its authority to create a danger or to render Ethan more vulnerable to danger than had it not acted at all, (2) the Byrnes do not plead conscience-shocking conduct, and (3) the Byrnes do not plead Ethan's suicide constituted a direct and foreseeable harm. We also dismiss the "shocks the conscience" claim. We dismiss the municipal liability claim because the Byrnes do not plead the School District maintains a policy causing constitutional violations. We dismiss the wrongful death claim and survival action because the Byrnes do not plead other substantive claims.

### A.      We dismiss the state-created danger claim.

Springfield argues we must dismiss the Byrnes' state-created danger claim because the Byrnes do not plead affirmative misuse of state authority creating or increasing danger to Ethan, conscience-shocking conduct, and direct and foreseeable harm. The Byrnes respond Principal Hepp took affirmative steps to conceal Ethan's bullying, causing his suicide. We agree with Springfield.

Congress "provides a remedy for violations of rights created by the Constitution or federal law" through section 1983.[77] To state a claim under section 1983, the Byrnes must "show that the defendants, acting under color of state law, deprived . . . [them] of a right secured by the

Constitution or the laws of the United States."[78]  The Byrnes allege Springfield deprived Ethan of

his rights under the Fourteenth Amendment's Due Process Clause.[79]

"Generally, the Due Process Clause does not impose an affirmative duty upon the state to

protect citizens from the acts of private individuals."[80]  An exception exists "when a 'state-created

danger' is involved."[81]  "[L]iability may attach where the state acts to *create* or *enhance* a danger

that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process."[82]

A state-created danger claim includes four elements:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff
> was a foreseeable victim of the defendant's acts, or a member of a discrete class
> of persons subjected to the potential harm brought about by the state's actions,
> as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger
> to the citizen or that rendered the citizen more vulnerable to danger than had
> the state not acted at all.[83]

We find the Byrnes do not sufficiently plead the first, second, and fourth elements.  "We

begin with the fourth element, as it is typically the most contested."[84]

**1.    The Byrnes do not plead Springfield affirmatively misused its authority
to create a danger or to render Ethan more vulnerable to danger than
had Springfield not acted at all.**

Springfield argues the Byrnes fail to plead Springfield affirmatively misused its authority

to create danger, arguing our Court of Appeals repeatedly rejected allegations like the Byrnes'.

The Byrnes respond Springfield took affirmative steps increasing Ethan's exposure to suicide, like

enacting policies non-compliant with Pennsylvania law and concealing Ethan's bullying.  We

agree with Springfield and find the Byrnes do not plead affirmative misuse of state authority

making Ethan more vulnerable to danger.

We must determine "whether the state's conduct created or increased the risk of danger to" Ethan.[85]  The Byrnes satisfy this element only if Springfield's "action was the 'but for cause' of the danger faced by" Ethan.[86]  Our Court of Appeals stresses the state must take "*affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger."[87]  "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."[88]  A plaintiff fails to plead a state-created danger claim by "redefin[ing] clearly passive inaction as affirmative acts."[89]  An "inherent difficulty" arises when "drawing a line between an affirmative act and a failure to act."[90]  So our Court of Appeals directs us "to first evaluate the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo."[91]

Reasoning from three of our Court of Appeals's decisions regarding schools' affirmative use of state authority guides our analysis today.

### i.    *Sanford v. Stiles*.

Our Court of Appeals addressed similar facts and affirmed an order of summary judgment to the school district where plaintiff alleged the school failed to protect a student from suicide.[92]  In *Sanford v. Stiles*, student Michael passed a note to student Karen, whom Michael had dated, mentioning he heard a story about Karen and another boy which "almost made [him] want to go kill [him]self."[93]  Karen disclosed the note to a guidance counselor, who disclosed it to Michael's guidance counselor, Stiles.[94]  Stiles "immediately" met with Michael and told him "some of his friends were worried about him, and that therefore she was worried about him."[95]  Michael responded "in a very straightforward manner" he was not upset about Karen.[96]  Stiles asked Michael if he planned to hurt himself; he responded, "definitely not."[97]  Stiles did not contact the school psychologist or Michael's mother.[98]  Michael visited Stiles one week later and asked who

showed her the note.[99]  Stiles said she could not disclose the information.[100]  Michael said "thanks . . . [t]hat's all I needed," and "did not seem upset."[101]  Michael committed suicide the same day.[102]  "[N]o one" thought Michael was suicidal.[103]  Michael's mother had read an instant message conversation between Michael and a friend in which Michael referenced "suicidal behavior," but she "was not concerned that Michael could be suicidal."[104]  Michael's mother sued the school, arguing Stiles affirmatively used state authority by interjecting herself into Michael's mental status, cutting off sources of aid, and failing to contact Michael's mother.[105]

Our Court of Appeals held Michael's mother failed to show the school misused its authority to render Michael more vulnerable to danger than had the school not acted.[106]  Our Court of Appeals held the mother impermissibly attempted to recharacterize Stiles's mere "failure to *prevent*" Michael's death as affirmative action.[107]  Our Court of Appeals supported its holding with three bases.  First, Michael visited Stiles on two occasions and Stiles did nothing during these meetings to agitate Michael or trigger his suicidality.[108]  Second, Michael did not rely on Stiles for support or guidance; rather, Stiles initiated the meetings and found "nothing was troubling" Michael.[109]  Third, Stiles did not "interfere" with Michael's relationship with his mother, so she did not influence his mother's decision not to intervene after seeing Michael's instant messages.[110]

### ii.    *Morrow v. Balaski.*

Our en banc Court of Appeals applied similar reasoning to hold a school's failure to protect a student from bullying did not constitute an affirmative misuse of authority.  In *Morrow v. Balaski*, two sisters endured a "series of threats and physical assaults" from a bully.[111]  The school suspended the bully.[112]  But the bully's assaults continued after she returned.[113]  The state court adjudicated the bully delinquent and ordered her not to contact one of her victims.[114]  The bully's school knew of the state court's order.[115]  But the bully later boarded the victim's school bus and

threatened her.[116]  She assaulted the victim again at a football game.[117]  The sisters' parents met

with school officials, who told them they could not guarantee the sisters' safety.[118]  Officials told

the parents to consider moving their children to another school.[119]  The parents sued the school,

arguing it affirmatively misused its authority by suspending the bully, then letting her return to

school and board the school bus in violation of school policy to create a danger.[120]

Our Court of Appeals held the parents failed to plead affirmative misuse of authority

because they failed to plead the school took any actual acts—just omissions.[121]  Our Court of

Appeals rejected the parents' argument the school permitting the bully to return following her

suspension constituted an affirmative act because it neither "created a new danger" nor rendered

the sisters "more vulnerable to danger than had the state not acted at all."[122]  Our Court of Appeals

also rejected the parents' argument the school misused its authority by violating school policy

when it failed to expel the bully following her juvenile adjudication.[123]  It reasoned the school

officials did not misuse their authority—they simply declined to use it.[124]  Our Court of Appeals

stressed the affirmative use requirement exists "to distinguish cases where . . . officials might have

done more . . . [from] cases where . . . officials created or increased the risk itself."[125]

### iii.       *L.R. v. School District of Philadelphia.*

We can contrast these cases with our Court of Appeals's finding a school affirmatively

misused its authority in *L.R. v. School District of Philadelphia*.[126]  A woman entered a

kindergartener's classroom and encountered the kindergartener's teacher.[127]  The teacher asked

the woman to identify herself and verify the kindergartener could leave school with her.[128]  The

woman failed to do either; still, the teacher released the kindergartener to the woman.[129]  The

woman sexually assaulted the kindergartener.[130]  The school moved to dismiss plaintiff's state-

created danger claim, arguing plaintiff failed to plead an affirmative misuse of authority.[131]

Our Court of Appeals affirmed Judge DuBois's denial of the school's motion, holding plaintiff plead affirmative misuse of state authority.[132]   Our Court of Appeals reasoned the teacher's act upset the status quo because the kindergartener "was safe in her classroom" until the teacher "permitted her to leave."[133]   The teacher exposed the kindergartener "to a danger she would not have otherwise encountered" by letting her leave.[134]   Our Court of Appeals distinguished *Morrow*, reasoning the teacher's actions caused "a drastic change to the classroom status quo, not a maintenance of a situation that was already dangerous."[135]

Our Court of Appeals's detailed analysis illustrates how the Byrnes do not plead Springfield affirmatively misused its authority to change the status quo.  The Byrnes repeatedly complain Springfield failed to protect Ethan from bullying and his resulting suicide.  They plead, for example, Principal Hepp never notified them of the bullying,[136] never investigated the bullying,[137] and never de-escalated or monitored Ethan's situation.[138]   These alleged acts are simply failures to use authority.  The Byrnes must plead the affirmative misuse of authority—not a mere failure to use it.  Such "inactions" are the exact type of allegations our Court of Appeals rejected in *Sanford* and *Morrow*.

The Byrnes' allegations are like those reviewed in *Sanford*.[139]   The three bases our Court of Appeals cited to find no affirmative acts in *Sanford* apply here:  Ethan met with Principal Hepp twice and the Byrnes do not plead Ethan provided Principal Hepp reason to suspect suicidality; the Byrnes do not plead Ethan relied on Principal Hepp for support or guidance; and Principal Hepp did nothing to change Ethan's parents' behavior.  In fact, the *Sanford* school had more reason to fear for Michael's safety than Springfield did for Ethan's, as Stiles knew Michael told another student he considered suicide.  The Byrnes plead Ethan spoke similarly to Student #1, but they do not plead Principal Hepp knew of it.

Principal Hepp's actions arguably crossed from inaction to action when he told Ethan "watch out because [people] are pissed," parents had seen his slur, and "[people] are talking about it."  But the Byrnes neither plead nor allow us to infer Principal Hepp's comments constituted the but-for cause of Ethan's suicide or changed the status quo.  They instead plead Ethan suffered danger before meeting with Principal Hepp.  The Byrnes plead, for example, Ethan had endured "unrelenting[,] consistent bullying."[140]  They plead Ethan had used a racial slur which circulated before he met with Principal Hepp, making Ethan "despair[]."[141]  Ethan had developed a "delicate psyche and emotional state."[142]  Ethan had told Student #1 he would kill himself if Student #1 revealed the slur to others.[143]  Principal Hepp's few comments to Ethan cannot have created a new danger or constituted the but-for cause of his suicide.  Maybe Principal Hepp could have "done more" to aid Ethan, but he did not "create[] or increase[] the risk itself."[144]  Our analysis is consistent with other judges dismissing claims school officials' comments to bullied students—even when far more insensitive than Principal Hepp's—create a new danger.[145]

The Byrnes do not distinguish *Sanford* and *Morrow*.  They argue *Sanford* and *Morrow* differ from this case because they "involved facts where the constitutional claim was based on the state actor failing to exercise authority."[146]  But *Sanford* and *Morrow* involved the same genre of allegations the Byrnes plead here:  a school failed to act to prevent harm to its students. The Byrnes argue Springfield maintained inadequate policies non-compliant with Pennsylvania law regarding bullying.  But like *Morrow*, a school's policy violations do not transform inaction into affirmative acts.

These allegations contrast the affirmative misuse of authority plead in *L.R.*  In *L.R.*, the teacher grossly upset the status quo by allowing the kindergartener to leave her safe classroom with a total stranger.  But for the teacher's action of releasing the student into a stranger's custody,

the status quo—safety—would have remained.  The teacher's action affirmatively created new danger.  Here, conversely, the Byrnes plead danger already existed when Principal Hepp met with Ethan.

The Byrnes cannot marshal their pleading into *L.R.*'s ambit.  They cite Judge Golden's 2007 finding a school's concealment of sexual assaults "might result in liability."[147]  But Judge Golden's analysis predates *Morrow*, which clarifies the standard for affirmative acts.  It is also distinguishable, as Judge Golden found pleadings the school district actively "suppress[ed] public knowledge of sexual assaults and . . . dissuade[d] students from reporting abuse" constituted "an active and concerted effort by defendants to conceal crimes."[148]  The Byrnes do not plead such severe conduct.  The Byrnes also cite our Court of Appeals's decision in *Kneipp v. Tedder*, where it found police acted affirmatively by separating a husband from his severely intoxicated wife, detaining the wife, then letting the wife walk home alone in freezing weather, causing her severe injury.[149]  *Kneipp*, like *L.R.*, involved affirmative acts because the police "used their authority as police officers" by detaining the wife and making her "more vulnerable to harm."[150]  The Byrnes do not plead such affirmative use of authority by a state actor.

We are also guided by our colleagues' dismissals when reviewing failures to plead affirmative action even when confronting allegations much more sinister than those presented today.  In *Lansberry v. Altoona Area School District*, parents sued after their seventh-grade son, W.J.L., committed suicide.[151]  The parents alleged W.J.L. experienced "intense, persistent, and malicious bullying" in school staff's presence.[152]  W.J.L. once endured bullying in a teacher's classroom.[153]  W.J.L. asked the teacher to let him see the guidance counselor.[154]  The teacher refused, telling W.J.L. he "needed to stop being a baby."[155]  W.J.L. committed suicide after a "particularly brutal day of bullying."[156]

14

Despite these disturbing allegations, Judge Gibson dismissed the state-created danger claim because plaintiffs failed to plead affirmative misuse of state authority.[157]  He reasoned the school's failure to stop the bullying "merely preserved the status quo."[158]  Judge Gibson found the teacher's "insensitive and inappropriate" comment to "stop being a baby" also did not constitute affirmative misuse of state authority for three reasons: (1) it simply maintained the status quo, (2) plaintiffs did not allege a causal connection between the comment and W.J.L.'s suicide, and (3) "an isolated comment by a teacher is fundamentally different from the conduct that courts have found to constitute affirmative uses of state authority," distinguishing *L.R.*[159]

The same three reasons exist here: (1) Principal Hepp's comments to Ethan maintained the status quo because he had already suffered bullying and suicidality, (2) the Byrnes do not plead how Principal Hepp's comments increased Ethan's risk, and (3) Principal Hepp's "isolated comment[s]" differ fundamentally from the severe allegations in *L.R.*  Judges overwhelmingly grant motions to dismiss claims schools created danger by failing to stop bullying.[160]  We find the Byrnes do not plead Springfield misused authority to create or increase any danger to Ethan.

## 2.     The Byrnes do not plead conscience-shocking conduct.

We join our Court of Appeals in recognizing there often appears "no clear line" between affirmative action and passive inaction, so we also analyze the first and second elements of state-created danger.[161]  We first analyze the second element: whether the Byrnes plead conscience-shocking conduct.  Springfield argues the Byrnes' allegations of general inactivity do not shock the conscience.  The Byrnes respond their Complaint "is replete with allegations of shocking actions."[162]  We agree with Springfield.  The Byrnes do not plead the deliberate indifference necessary to shock the conscience.

Whether state actions are "conscience-shocking . . . depend[s] upon the facts of each individual case."[163]  "[I]n cases where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference" constitutes conscience-shocking conduct.[164] Deliberate indifference requires a "conscious disregard of a substantial risk of serious harm."[165] Our Court of Appeals stresses regardless of how long the state actor could deliberate, "the state actor's behavior must *always* shock the conscience"; "[m]ere negligence is not enough."[166]

We return to our Court of Appeals's analysis in *Sanford* and *L.R.* for guidance.  In *Sanford*, our Court of Appeals found—after exhaustively detailing jurisprudence regarding conscience-shocking conduct—plaintiff failed to adduce evidence of conscience-shocking conduct.[167]  Our Court of Appeals determined the "relevant question is *not* whether Stiles *should have* contacted the school psychologist or Michael's parent"; rather, "the question is whether, under the circumstances, Stiles' decisions shock the conscience."[168]  It found low "gravity" of risk because no one suspected Michael would commit suicide.[169]  Our Court of Appeals also found Stiles did not "disregard[] any risk that Michael presented" because she "did not simply ignore the note" Michael gave Karen.[170]  "To the contrary, she promptly spoke with Michael," finding he exhibited no suicidality.[171]  Michael's assurance he "was no longer upset" bolstered Stiles's judgment.[172]

In *L.R.*, conversely, our Court of Appeals found the teacher's conduct shocked the conscience.[173]  It reasoned "the risk of harm in releasing a five-year-old child to an unidentified, unverified adult is so obvious as to rise to the level of deliberate indifference."[174]  The teacher asking the stranger for identification illustrated the teacher understood the danger of releasing the student to an unidentified person.[175]

The Byrnes do not plead conscience-shocking conduct because they do not plead (1) a substantial risk of harm which (2) Springfield deliberately disregarded.[176]

16

   **i.**   **The Byrnes do not plead substantial risk of harm.**

  The Byrnes do not plead facts showing Ethan presented a substantial risk of suicide to Springfield.  The Byrnes plead damning conclusions about Principal Hepp:  he was "fully aware of the magnitude of the bullying Ethan had been enduring and its deleterious consequences on Ethan's delicate psyche and emotional state,"[177] and he "knew that a victim of bullying might resort to self-harm, even suicide."[178]  But the Byrnes do not allege ***how*** Principal Hepp came to possess this information.[179]  The Byrnes do not plead, for example, Ethan reported bullying to Springfield or suffered bullying in the presence of Springfield officials.  Ethan privately discussed suicide and despaired to friends, but the Byrnes do not plead facts allowing us to infer Principal Hepp knew of this.  The Byrnes characterize Ethan's meetings with Principal Hepp as "about the unrelenting consistent bullying Ethan was receiving in-person at school and through social media."[180]  But the allegations regarding the meeting do not support this characterization.  Principal Hepp simply notified Ethan at the meetings people were "pissed" and "talking" about his slur.  Ethan left the meetings thinking he was "not in trouble" because Principal Hepp believed Ethan did not post the slur.[181]

  The Byrnes plead only two facts regarding Principal Hepp's knowledge about the bullying.  First, they plead Genevieve Byrne's friend, who worked at Springfield High, said "it was common knowledge at [Springfield High] that Ethan had been bullied."[182]  But this allegation does not explain how Principal Hepp, as opposed to people generally associated with Springfield, may have known Ethan suffered bullying.  It also lacks sufficient detail regarding the bullying for us to infer Principal Hepp should have appreciated a "substantial risk" of suicide.  Second, the Byrnes plead cyberbullying contributed to a thirteen-year-old girl's suicide in 2002 or 2003.[183]  The Byrnes do not plead whether Principal Hepp knew of this.  Even if they did, we cannot infer from this

allegation of an unrelated suicide eighteen years ago Principal Hepp should have appreciated a "substantial" risk Ethan might also commit suicide.

Like *Sanford*, the Byrnes plead low "gravity" of risk because Ethan provided no reason to suspect danger from using a slur online.  The circumstances causing Ethan's death "are still not fully known and Ethan's parents never suspected he could become suicidal.[184]  Unlike *L.R.*, Principal Hepp cannot have appreciated an "obvious" risk of harm.  The Byrnes do not plead facts making it plausible Principal Hepp knew or should have known of a substantial risk.

### ii.     Springfield did not consciously disregard a substantial risk.

The Byrnes do not plead Principal Hepp exhibited conscious disregard.  The Byrnes do not plead Principal Hepp ignored Ethan's trouble.  He twice met with Ethan to discuss his use of the slur and "make [him] aware" people knew of it.  Like *Sanford*, Principal Hepp did not "simply ignore" the situation.[185]

Perhaps Principal Hepp's comments Ethan should "watch out" because "people are pissed" constitute negligence.  But "[m]ere negligence" does not shock the conscience.[186]  We are persuaded by the analysis granting motions to dismiss state-created danger claims for failure to plead appropriate culpability.[187]  The Byrnes do not plead Springfield acted with a degree of culpability shocking the conscience.

### 3.     The Byrnes do not plead Ethan's suicide constituted a foreseeable and fairly direct harm.

We finally address the first element of state-created danger:  whether the harm ultimately caused was "foreseeable and fairly direct."  Springfield argues the Byrnes do not plead Ethan's suicide constituted a foreseeable and fairly direct harm because the Byrnes do not plead Springfield knew of a risk to Ethan.  The Byrnes respond they plead Principal Hepp appreciated the risk of suicide.  We again agree with Springfield.

"[T]o adequately plead 'foreseeability,' plaintiff must 'allege an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm.'"[188] "Under Third Circuit jurisprudence, a harm is foreseeable when a state actor has actual awareness, based on concrete information, of a risk of harm to an individual or class of individuals such that the actor is on notice that his or her act or failure to act significantly enhances that risk of harm."[189]

Two decisions from our colleagues regarding foreseeability in claims against schools provide guidance.  First, in *Keener v. Hribal*, Judge Fischer found a student's "stabbing rampage" of others in school did not constitute a foreseeable and fairly direct harm despite the school employing inadequate security and knowing the student exhibited "serious mental illness and violent propensities."[190]  Judge Fischer reasoned plaintiff plead no "concrete information of any kind," like previous violent incidents, making the rampage foreseeable.[191]  She also found the rampage was not a "fairly direct" result of the school's affirmative acts because plaintiff merely plead failures to implement proper security measures, which did not "provide a sufficient basis to establish causation."[192]  Second, in *Beam v. Western Wayne School District*, Judge Caputo found a student's suicide did not constitute a foreseeable and fairly direct harm of the school's failure to implement an educational plan and communicate the student's failing grades to his parents.[193]  The student's therapist informed the school the student exhibited suicidal ideation in direct response to his poor grades.[194]  Judge Caputo found the student's suicide did not constitute a direct and foreseeable harm related to the school's failures to communicate his failing grades because the causation was "too attenuated."[195]

The Byrnes do not sufficiently plead Ethan's suicide constituted a foreseeable and fairly direct result of the school's few actions.  These facts are in accord with those presented in *Keener*.

The Byrnes do not plead "concrete" facts showing Springfield knew of Ethan's bullying or suicidality, as we discussed above.[196]  They also do not plead Springfield's action are a "fairly direct" cause of Ethan's decision to take his life; rather, they plead bullying and others' discussions of Ethan's slur caused Ethan to despair.  Like *Beam*, Springfield's failures to contact Ethan's parents and Principal Hepp's comments are far "too attenuated" from Ethan's suicide to make it foreseeable.

The Byrnes argue it is foreseeable as a matter of law bullying victims "may resort to . . . suicide" because the Court of Appeals for the Sixth Circuit held as much in *Tumminello v. Father Ryan High School, Inc.*[197]  But the court of appeals's analysis in *Tumminello* supports Springfield's position, not the Byrnes' position.  The court dismissed plaintiff's claims against the school because—as here—the plaintiff failed to allege the school knew of "the abuse and harassment" a bullying victim who committed suicide had suffered.[198]  The plaintiff plead "no facts that any teacher saw or heard the bullying, that . . . [students] told anyone at the school what was happening, or any other fact to support an inference that [the school] had any knowledge of the situation."[199]  The same pleading deficiencies exist here.  We dismiss the Byrnes' state-created danger claim.

### B.    We dismiss the Byrnes' separate "shocks the conscience" claim.

The Byrnes claim in a separate count Springfield's actions shocked the conscience.  Springfield argues we must dismiss this claim because it repeats the Byrnes' state-created danger claim.  The Byrnes respond they plead the "shocks the conscience" claim separately because "Third Circuit precedent appears to be confusing" regarding whether plaintiffs may state a "shocks the conscience claim."[200]  We agree with Springfield. We need not address the confusion the Byrnes cite because, regardless of whether "[s]hocks the conscience" is a free-standing theory of liability under section 1983, the Byrnes do not plead conscience-shocking conduct. As we

discussed above, the Byrnes do not plead Springfield acted with the deliberate indifference required to shock the conscience.[201]  We dismiss this claim.

### C.  We dismiss the Byrnes' municipal liability claim.

Springfield argues the Byrnes fail to plead the School District maintains a policy or custom causing constitutional violations.  The Byrnes respond the School District maintained "legally noncompliant" policies.  We agree with Springfield.

A municipality may be liable under section 1983 if its (1) "policy, custom, or practice" (2) causes "constitutional violations."[202]  "A policy is made 'when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict.'"[203]  "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'"[204]  Relevant here, "a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."[205]

A municipality may also face liability for failing to "train its employees on avoiding constitutional violations."[206]  "To show the deliberate indifference required for a 'failure to train' claim, a [section] 1983 plaintiff must show 'a municipal actor disregarded a known or obvious consequence of his action.'"[207]  But no liability attaches unless the plaintiff also pleads "the violation of a specific constitutional right."[208]

We dismiss the municipal liability claim because a policy or custom permitting failures to stop bullying does not cause constitutional violations.  The Byrnes couch their municipal liability claim in the same allegations as their state-created danger claim:  they plead the School District

failed to maintain an adequate policy for responding to bullying, train its officials regarding bullying, investigate Principal Hepp's actions, and notify parents of bullying.[209]  As we discussed, the Constitution does not compel schools to intervene to stop bullying.  The Byrnes misapprehend their municipal liability claim by arguing the School District's policy "fails to comply with the state-mandated requirement to promptly notify parents and guardians of bullying incidents."[210]  We must determine whether the policy causes constitutional violations, not violations of Pennsylvania law.

The Byrnes also do not plead the School District's failure to train creates constitutional violations because they do not plead Ethan suffered any constitutional violation.  We must remain mindful the Constitution does not obligate public schools to protect students from each other or themselves; it protects only against harm "caused by state actors."[211]  Our Court of Appeals affirmed dismissals of municipal liability claims premised on schools' failures to stop bullying.[212]  Our colleagues follow suit.[213]  We dismiss the Byrnes' municipal liability claim.[214]

D.      We dismiss the Byrnes' wrongful death and survival actions.

Springfield argues the Byrnes' wrongful death and survival actions fail because their substantive claims fail.  The Byrnes respond they stated substantive claims.  We agree with Springfield.

"Under Pennsylvania law, 'wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death.'"[215]  "Because wrongful death and survival actions are not independent claims, a plaintiff asserting these claims must assert some other independent, cognizable claim to survive a motion to dismiss the wrongful death and survival claims."[216]  We dismiss the Byrnes'

wrongful death claim and survival action because, as we discussed above, the Byrnes do not plead

other "independent, cognizable" claims.

## III.    Conclusion

We grant Springfield's Motion to dismiss as the Byrnes have not plead the level of state

actor involvement or conduct under governing law.  We grant the Byrnes leave to timely file an

amended complaint if they can plead the facts necessary to state a claim within our limited subject

matter jurisdiction.[217]

---

[1] ECF Doc. No. 1 ¶ 33.

[2] *Id.* ¶ 34.

[3] *Id.* ¶ 35.

[4] *Id.* ¶ 36.

[5] *Id.* ¶ 39.

[6] *Id.* ¶¶ 26, 40.

[7] *Id.* ¶¶ 1, 48.

[8] *Id.* ¶ 17.

[9] *Id.* ¶ 20.

[10] *Id.* ¶ 22.

[11] *Id.* ¶¶ 47–48.  According to its website, Black Lives Matter Global Network Foundation, Inc. is a "global organization . . . whose mission is to eradicate white supremacy and build local power to intervene in violence inflicted on Black communities by the state and vigilantes."  *About*, Black Lives Matter, available at https://blacklivesmatter.com/about/ (last visited Oct. 13, 2021).

[12] ECF Doc. No. 1 ¶ 48.

[13] *Id.* ¶ 49.

[14] *Id.* ¶ 51.

[15] *Id.*

[16] *Id.*

[17] *Id.* ¶ 52.

[18] *Id.*

[19] *Id.* ¶ 53 (internal alternations omitted).

[20] "Black Twitter" is "a network of culturally connected communicators using [Twitter] to draw attention to issues of concern to black communities." *Black Twitter 101: What is it? Where Did it Originate? Where is it Headed?*, UVA Today (Nov. 28, 2018), available at https://news.virginia.edu/content/black-twitter-101-what-it-where-did-it-originate-where-it-headed.

[21] ECF Doc. No. 1 ¶ 53.

[22] *Id.* ¶ 54.

[23] *Id.* ¶ 55.

[24] *Id.* ¶ 57 (internal alteration omitted).

[25] *Id.* ¶ 58 (alteration in original).

[26] *Id.* ¶ 59 (second and third alterations in original).

[27] *Id.* ¶ 60.

[28] *Id.* ¶ 61.

[29] *Id.* ¶¶ 63–64.

[30] *Id.* ¶ 65.

[31] *Id.* ¶ 66.

[32] *Id.* ¶¶ 67–68.

[33] *Id.* ¶ 70.

[34] *Id.* ¶¶ 69, 71.

[35] *Id.* ¶ 72.

[36] *Id.*

[37] *Id.* ¶ 74.

[38] *Id.* ¶ 75.

[39] *Id.*

[40] *Id.* ¶ 77.

[41] *Id.* (internal quotations omitted).

[42] *Id.* ¶ 78 (first and third alterations in original).

[43] *Id.* ¶ 80.

[44] *Id.* ¶ 81.

[45] *Id.* ¶ 82.

[46] *Id.*

[47] *Id.* ¶ 83.

[48] *Id.* ¶ 3.

[49] *Id.* ¶ 111.

[50] *Id.* ¶ 84 (first and third alterations in original).

[51] *Id.* ¶¶ 86–87 (alteration in original).

[52] *Id.* ¶ 88.

[53] *Id.*

[54] *Id.* ¶ 89 (alteration in original).

[55] *Id.* ¶ 85.

[56] *Id.* ¶ 92.

[57] *Id.*

[58] *Id.* ¶ 93.

[59] *Id.* ¶ 41.

[60] *Id.* ¶ 107.

[61] *Id.* ¶ 108.

[62] *Id.* ¶ 110.

[63] *See id.* at 1–2.  We use "Springfield" to refer to all Defendants.

[64] *Id.* ¶ 127.

[65] *Id.* ¶¶ 113–14.

[66] *Id.* ¶ 116.

[67] *Id.* ¶ 118.

[68] *Id.* ¶¶ 139–162.

[69] ECF Doc. No. 7.  Federal Rule of Civil Procedure 12(b)(6) requires a complaint to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint.  *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019).  If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint.  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)).  "A claim has facial plausibility when the plaintiff pleads factual content . . . allow[ing] the court to draw the reasonable inference . . . the defendant is liable for the misconduct alleged."  *Robert W. Mauthe M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017)).  While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility . . . a defendant has acted unlawfully."  *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient."  *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."  *Robert W. Mauthe, M.D., P.C.*, 806 F. App'x at 152 (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)).  Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that . . . 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-

pleaded factual allegations,' we 'assume their veracity' . . . in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations . . . and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]' . . ., we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[70] ECF Doc. No. 7 at 7–15.

[71] *Id.* at 15–16.

[72] *Id.* at 16–20.

[73] *Id.* at 6–7, 20–22.

[74] ECF Doc. No. 9 at 19–24.

[75] *Id.* at 25–28.

[76] *Id.* at 31–32.

[77] *Beam v. W. Wayne Sch. Dist.*, 165 F. Supp. 3d 200, 213 (M.D. Pa. 2016) (citing 42 U.S.C. § 1983).

[78] *Id.*

[79] ECF Doc. No. 1 at 23–25.

[80] *Sanford v. Stiles*, 456 F.3d 298, 303–04 (3d Cir. 2006) (per curiam) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–200 (1989)).

[81] *Id.* at 304 (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir. 1997)).  Our Court of Appeals recognizes a second exception when a "special relationship" exists between the individual and the state.  *Id.*  The exception does not apply here, as "no special relationship exists between school children and the state."  *Id.* at 304 n.4 (citing *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1371–73 (3d Cir. 1992)).

[82] *Id.* (emphasis in original) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).

[83] *Id.* at 304–05 (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006)).

[84] *Lansberry v. Altoona Area Sch. Dist.*, 318 F. Supp. 3d 739, 755 (W.D. Pa. 2018) (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242 (3d Cir. 2016)).

[85] *L.R.*, 836 F.3d at 242.

[86] *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006).

[87] *Bright*, 443 F.3d at 282 (emphasis in original).

[88] *Id.*

[89] *Morrow v. Balaski*, 719 F.3d 160, 178 (3d Cir. 2013) (en banc), *as amended* (June 14, 2013).

[90] *L.R.*, 836 F.3d at 242.

[91] *Id.* at 243.

[92] *Sanford*, 456 F.3d at 301.

[93] *Id.*

[94] *Id.* at 302.

[95] *Id.*

[96] *Id.* (internal quotations omitted).

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.* at 303.

[104] *Id.*

[105] *Id.* at 311.

[106] *Id.* at 312.

[107] *Id.* (emphasis in original).

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Morrow*, 719 F.3d at 164.

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.* at 164–65.

[120] *Id.* at 177.

[121] *Id.* at 177–79.

[122] *Id.* at 178.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 179 (alterations and omissions in original) (quoting *id.* at 186 (Ambro, J., concurring and dissenting)).

[126] *L.R.*, 836 F.3d at 242–44.

[127] *Id.* at 239–40.

[128] *Id.* at 240.

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] *Id.* at 242–44.

[133] *Id.* at 243.

[134] *Id.*

[135] *Id.* at 244.

[136] *See, e.g.*, ECF Doc. No. 1 ¶¶ 4, 9.

[137] *Id.* ¶ 116.

[138] *Id.* ¶ 120.

[139] We acknowledge *Sanford* affirmed a summary judgment order, not dismissal from a motion to dismiss.  It still establishes the contours of affirmative acts as a matter of law.  We take the Byrnes' well-plead allegations as true and ask whether they plead a state-created danger claim under *Sanford*'s framework.  *See Oakwood Lab'ys*, 999 F.3d at 904.

[140] ECF Doc. No. 1 ¶ 2.

[141] *Id.* ¶ 85.

[142] *Id.* ¶ 3.

[143] *Id.* ¶ 59.

[144] *Morrow*, 719 F.3d at 179.

[145] *See, e.g.*, *G.S. v. Penn-Trafford Sch. Dist.*, 813 F. App'x 799, 802 (3d Cir. 2020) (assistant principal's comment to bullying victim she would win a fight with her bully constituted an affirmative use of state authority, but it did not make victim "more vulnerable to danger"—even where the victim later suffered severe injuries in the fight—because no "direct causal relationship" existed between comments and harm; the principal commented about the fight only because a danger of it occurring already existed); *Lansberry*, 318 F. Supp. 3d at 755–56 (teacher's comment bullying victim should "stop being a baby," while "insensitive and inappropriate," not an affirmative act creating danger).

[146] ECF Doc. No. 9 at 24.

[147] *Doe v. Allentown Sch. Dist.*, No. 06-1926, 2007 WL 2814587, at *6 (E.D. Pa. Sept. 21, 2007).

[148] *Id.* at *5–6.

[149] 95 F.3d at 1208–10.

[150] *Id.* at 1209.

[151] 318 F. Supp. 3d at 745.

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.* at 753.

[158] *Id.* at 756.

[159] *Id.* at 756–57.

[160] *See, e.g.*, *G.S.*, 813 F. App'x at 802 (we cannot infer affirmative action from allegations of mere failure to prevent bullying because "inaction does not give rise to an affirmative act"); *Messina v. Mastery Charter Sch.*, No. 20-915, 2020 WL 4601182, at *3 (E.D. Pa. Aug. 11, 2020) (failure to protect student from "physical, verbal and emotional abuse at the hands of fellow students" does not constitute an affirmative act under *Morrow*); *MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 589 (W.D. Pa. 2019) ("The Third Circuit has repeatedly rejected state-created danger claims involving peer harassment or violence, even when school officials allegedly knew of the dangerous conditions ultimately resulting in injury to the plaintiffs, when those officials did not affirmatively act to create the danger."); *T.C. v. Hempfield Area Sch. Dist.*, No. 17-1507, 2019 WL 1932377, at *8 (W.D. Pa. May 1, 2019) (allegations school inadequately supervised student despite knowledge he endured bullying suggested the school "could and should have done more," but did not show affirmative action); *H.J. by Wells v. Delaplaine McDaniel Sch.*, No. 17-3229, 2017 WL 5901096, at *4 (E.D. Pa. Nov. 30, 2017) (to plead state-created danger claim for failure to prevent bullying, plaintiff needed to plead "an active effort on the part of the school to encourage bullying, and an effort to make the school a less safe place for the children"); *Roquet v. Kelly*, No. 11-01763, 2013 WL 5570269, at *7 (M.D. Pa. Oct. 9, 2013) (school's failure to respond to separate student from bully with history of violence did not put student in a worse position); *Monn v. Gettysburg Area Sch. Dist.*, No. 12-2085, 2013 WL 1345501, at *7 (M.D. Pa. Apr. 2, 2013) (repeated allegations school "officials failed to prevent future bullying after initial complaints of bullying . . . cannot be characterized as an affirmative misuse of the authority"), *aff'd*, 553 F. App'x 120 (3d Cir. 2014).

[161] *See L.R.*, 836 F.3d at 243.

[162] ECF Doc. No. 9 at 20.

[163] *Sanford*, 456 F.3d at 305–06 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)).

[164] *Id.* at 309.

[165] *L.R.*, 836 F.3d at 246 (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973–74 (3d Cir. 2015)).

[166] *Sanford*, 456 F.3d at 310–11 (emphasis in original).

[167] *Id.* at 305–11.

[168] *Id.* at 311.

[169] *Id.*

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] *L.R.*, 836 F.2d at 246–47.

[174] *Id.* at 246 (quotations omitted).

[175] *Id.*

[176] We apply a deliberate indifference standard because Principal Hepp could make "unhurried judgments" about how to handle Ethan's situation by meeting Ethan twice over four days. *See, e.g.*, *Sanford*, 456 F.3d at 311 (suggesting—without deciding—deliberate indifference applied because Stiles did not need to act "in a matter of hours or minutes").

[177] ECF Doc. No. 1 ¶ 3.

[178] *Id.* ¶ 114.

[179] *See Burnett v. Springfield Twp.*, No. 13-1646, 2014 WL 3109963, at *5 (E.D. Pa. July 8, 2014) ("Allegations about other people's mental states are conclusory unless they are linked to facts from which the relevant mental state might be inferred.").  We remind litigants "conclusions[] are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.

[180] ECF Doc. No. 1 ¶ 2.

[181] *Id.* ¶ 89.

[182] *Id.* ¶ 108.

[183] *Id.* ¶ 31.

[184] *Id.* ¶¶ 22, 41.

[185] *See Sanford*, 456 F.3d at 311.

[186] *Id.*

[187] *See, e.g.*, *Messina*, 2020 WL 4601182, at *4 (granting school's motion to dismiss where school called police in response to bullied student's father's "belligerence" because allegations did not show deliberate indifference to son's well-being); *Luu v. Esterly*, 367 F. Supp. 3d 335, 345–46 (E.D. Pa. 2019) (granting motion to dismiss because school's failure to notify parent of student's absence, which violated its policy, insufficient to show deliberate indifference because school was merely negligent in failing to heed its own policy), *appeal dismissed*, No. 19-1585, 2019 WL 4316869 (3d Cir. Aug. 7, 2019); *Keener v. Hribal*, 351 F. Supp. 3d 956, 962, 973 (W.D. Pa. 2018) (plaintiff failed to plead conscience-shocking conduct after another student stabbed twenty students in school "rampage" where plaintiff alleged the school "(1) failed to properly implement and maintain safety measures in the event of emergencies, despite knowing that students faced a substantial risk of harm; (2) failed to ensure . . . adequate security; and (3) hired . . . [inadequate security] as a means to placate parents and students" because "these allegations, at most, amount to negligence").  *See also Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 177 (3d Cir. 2016) (granting school's summary judgment motion because principal met with bullied students, evidencing no disregard of student's need).

[188] *L.R. v. Sch. Dist. of Phila.*, 60 F. Supp. 3d 584, 589 (E.D. Pa. 2014) (alteration in original) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008)), *aff'd*, 836 F.3d 235.

[189] *Gremo v. Karlin*, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005); *see also Morse*, 132 F.3d at 908–09 (where defendants left back door of a high school unlocked, then someone entered the school's daycare and committed murder, the risk of harm was "too attenuated" from leaving the door unlocked "to support liability" because defendants were not aware of any "credible threat of violence").

[190] *Keener*, 351 F. Supp. 3d at 962, 972–73.

[191] *Id.* at 971–72.

[192] *Id.* at 972.

[193] 165 F. Supp. 3d at 204, 214–15.

[194] *Id.* at 206.

[195] *Id.* at 214 (quoting *Morse*, 132 F.3d at 909).

[196] *See supra* Part II.A.2.i.

[197] ECF Doc. No. 9 at 19–20; ECF Doc. No. 1 at 2 (quoting *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 288 (6th Cir. 2017)).

[198] *Tumminello*, 678 F. App'x at 288.

[199] *Id.* No judge in our Circuit has cited *Tumminello*—an unpublished, non-binding decision—for the proposition a bullying victim's suicide is foreseeable as a matter of law.

[200] ECF Doc. No. 9 at 17.

[201] *See supra* Part II.A.2.ii.

[202] *Lansberry v. Altoona Area Sch. Dist.*, 356 F. Supp. 3d 486, 497 (W.D. Pa. 2018) [hereinafter "*Lansberry II*"].

[203] *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Kneipp*, 95 F.3d at 1212).

[204] *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 404 (1997)).

[205] *Id.* (multiple quotations omitted).

[206] *Lansberry II*, 356 F. Supp. 3d at 498.

[207] *Id.* (quoting *Wright v. City of Phila.*, 686 F. App'x 142, 147 (3d Cir. 2017)).

[208] *Id.*

[209] ECF Doc. No. 1 ¶¶ 146–51.

[210] ECF Doc. No. 9 at 26.

[211] *Lansberry II*, 356 F. Supp. 3d at 503.

[212] *G.S.*, 813 F. App'x at 803 ("G.S. argues that the school district had a policy of ignoring reports of bullying, which caused students to be physically assaulted. This argument fails because . . . a school's failure to respond to reports of bullying cannot give rise to liability under § 1983 because it is not an affirmative act."); *Bridges*, 644 F. App'x at 178 (affirming summary judgment to school on plaintiff's failure-to-train claim because "there was no underlying constitutional violation").

[213] *See, e.g.*, *Lansberry II*, 356 F. Supp. 3d at 502 (despite "appalling" bullying student endured, "harm caused by student-on-student bullying is not a constitutional harm").

[214] Springfield also argues it is unclear whether the Byrnes assert due process claims on their own behalf against Springfield, but we should dismiss such claims if they did. ECF Doc. No. 7 at 20. The Byrnes respond they do plead such claims because Springfield violated their fundamental

34

constitutional rights as parents by "deliberately" harming the Byrnes' relationship with Ethan. ECF Doc. No. 9 at 28–29. We disagree. The Byrnes appear to plead Springfield violated their fundamental right to "protect" Ethan from danger. ECF Doc. No. 1 ¶ 140. "[O]nly deliberate conduct implicates due process." *Chambers ex rel. Chambers v. Sch. Dist. Of Phila. Bd of Educ.*, 587 F.3d 176, 192 (3d Cir. 2009). The Byrnes must plead Springfield "deliberately sought to harm their relationship" with Ethan. *Id.* "Merely negligent conduct . . . does not suffice." *Id.* As we discussed above, the Byrnes fail to plead Springfield took deliberate actions affecting Ethan's constitutional rights. Likewise, Springfield did not take deliberate actions affecting the Byrnes' relationship with Ethan; Springfield simply failed to act. *See id.* at 179–80, 192 (plaintiffs failed to allege school district deliberately sought to harm their relationship with their child based on allegations school failed to provide adequate special education placement).

Principal Hepp also argues qualified immunity shields him from liability. *Id.* at 20–21. We need not reach this issue as we dismiss all claims.

[215] *Lansberry II*, 356 F. Supp. 3d at 504 (quoting *Johnson v. City of Phila.*, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015)).

[216] *Id.*

[217] The Byrnes sought leave to amend. ECF Doc. No. 9 at 10. We "must permit a curative amendment, unless an amendment would be inequitable or futile." *G.S.*, 813 F. App'x at 803 (quoting *Phillips*, 515 F.3d at 236). We cannot presently determine whether amendment would be futile. We will dismiss without prejudice and permit the Byrnes to amend their Complaint if they may plausibly allege the elements of state-created danger. *See, e.g.*, *id.*; *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 626 (E.D. Pa. 2015).